**UNITED STATES of America,**
**Plaintiff,**

**v.**

**The LUCKY LAGER BREWING COMPANY OF SAN FRANCISCO,**
**Defendant.**

**No. C 15–58.**

United States District Court
D. Utah,
Central Division.

Oct. 3, 1962.

666

Lyle L. Jones, Luzerne E. Hufford, Jr., San Francisco, Cal., William T. Thurman, U. S. Atty., Salt Lake City, Utah, for plaintiff.

Grant C. Aadnesen, Salt Lake City, Utah, C. Preston Allen, Murray, Utah, Gerald H. Trautman, William W. Schwarzer, Francis M. Small, San Francisco, Cal., for defendant.

CHRISTENSEN, District Judge.

The present issue is whether the court should modify the consent decree herein upon the claim of the defendant that there has been a substantial change in the competitive situation existing at the time of its entry.

The Lucky Lager Brewing Company relies upon principles set out in United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), to support, and the Government relies upon the same case to defeat, the motion for modification.

The issue was presented and argued orally on July 2, 1962, and has now been submitted for decision upon written briefs.

For the reasons and under the circumstances hereinafter explained, I am of the opinion that the motion for modification should be, and it is hereby denied, without prejudice to its renewal if and when, after a reasonable period of testing there appear substantially changed conditions the nature and extent of which cannot then be deemed reasonably to have been within the contemplation of the parties and the court at the time the original decree was entered, in the light of principles hereafter discussed.

The United States brought this action pursuant to Sections 7[1] and 15 of the Clayton Act (15 U.S.C.A. §§ 18, 25) to require the defendant, The Lucky Lager Brewing Company of San Francisco, called "Lucky Lager" hereafter, to divest itself of the business and assets of Fisher Brewing Company, hereinafter called "Fisher".

The complaint alleged that prior to the acquisition of Fisher by Lucky Lager, Fisher was the largest seller of beer in the West and the twelfth largest in the United States, and that it had the largest annual capacity for the production of beer in Utah (62% of the state's productive capacity). The defendant Lucky Lager, it was said, accounted for about 12% of the total volume of beer sold in Utah in 1956. Together, the two companies, Lucky Lager and Fisher, sold approximately 51% of the total volume of beer sold in Utah in 1956.

It was charged by the Government that on or about June 30, 1957, in connection with the settlement of a private antitrust suit which had been brought against Lucky Lager by Fisher and which had resulted in a substantial judgment for

1. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. * * *"

damages,[2] Lucky Lager acquired the assets and business of Fisher and that the effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in the production and sale of beer in the state of Utah in violation of Section 7 of the Clayton Act in the following ways, among others:

(a) Actual and potential competition between Fisher and Lucky Lager in the sale of beer in the state of Utah had been eliminated;

(b) Actual and potential competition generally in the sale of beer in Utah may be substantially lessened;

(c) Fisher had been permanently eliminated as an independent competitive factor in the sale of beer in Utah;

(d) The acquisition may enhance Lucky Lager's competitive advantage in the production and sale of beer in Utah to the detriment of actual and potential competition; and,

(e) Industry-wide concentration of the sale of beer in Utah will be increased.

Included in the relief sought by the complaint was that the court require Lucky Lager to divest itself of all the business and assets of Fisher.

The defendant answered admitting various allegations of the complaint concerning the business of Lucky Lager and Fisher including the fact that the acquisition of Fisher by Lucky Lager had occurred and that at that time Fisher had the largest annual capacity for the production of beer in Utah. Violation of the Clayton Act, however, was denied.[3] On October 6, 1958, following a pre-trial conference in which the possibility of an agreed settlement was discussed, the court signed and entered a "final judgment", based upon an endorsement signed by counsel for all of the parties that "We hereby consent to the making and entry of the foregoing final judgment". The judgment recited that plaintiff and defendant had severally consented to the judgment "without trial or adjudication of any issue of fact or law herein and without any admission by plaintiff or defendant with respect to any issue".

Section V of the consent judgment ordered the defendant Lucky Lager to sell all of its interest in Fisher within nine months of the appointment by the court of a sales agent but provided that if no buyer could be found this section could be canceled upon the petition of either party.

Section VI of the judgment provided that in the event of a cancelation of Section V as a result of inability to consummate a sale, Lucky Lager should be "perpetually enjoined and restrained, beginning twelve months from the date of said cancellation, from selling for consumption in the state of Utah under any labels owned or controlled by Lucky Lager, Fisher or subsidiaries or affiliates of either of them in any calendar year more than 39 per cent of the quantity of 'Total Beer Consumed' in the State of Utah, as reported by the Auditing Division of the Utah State Tax Commission for the previous calendar year."

By Section VIII of the consent judgment the court retained jurisdiction for the purpose of enabling any of the parties to apply to the court for further orders and directions for the construction or carrying out of the judgment or for the modification, termination or enforcement of any of the provisions thereof.

No sale of the defendant's interest in Fisher having been consummated by July 7, 1959, the court, pursuant to the judgment and without objection by either party, canceled Section V of the judg-

2. C-1-56, Fisher Brewing Company vs. The Lucky Lager Brewing Company, in the United States District Court for the District of Utah, Central Division.

3. In its pre-trial brief the defendant Lucky Lager stated as among the issues for trial the following: "What is the relevant section of the country? May the effect of the acquisition be substantially to lessen competition or to tend to create a monopoly in the production and sale of the relevant product in the relevant section of the country? Is this an appropriate case for divestiture?

ment requiring Lucky Lager to divest itself of its interest in Fisher, thereby making operative the 39% limitation at the close of the ensuing twelve month period, or on July 7, 1960.

The defendant's motion for modification of final judgment was filed June 13, 1962, and is based upon the alleged ground that since the entry of the consent judgment the competitive conditions in Utah and other intermountain states have so materially changed that the need for a limitation on defendant's sales in Utah no longer exists and that the continuation of said limitation is in fact restraining, rather than promoting, competition.

There is no doubt that the court upon general principles and by reason of the express reservation in the judgment for substantially changed conditions has the power to modify a consent judgment or decree. But the impropriety of merely relieving a party from the foreseeable detrimental consequences of its consent, after it has enjoyed or speculated upon its favorable consequences or possibilities by avoiding the litigation and the hazards of a less favorable outcome, is quite manifest.

Defendant morally and legally is in no position now to complain of any improvident or erroneous provision which it invited, especially if the injustice is not pronounced or disastrous; and there are sound reasons why the court should not lightly cast aside requirements which have been fashioned by agreement of the parties themselves. The standards which should guide a consideration of the motion for a modification are concisely and authoritatively summarized in United States v. Swift & Company, 286 U.S. 106, 119, 52 S.Ct. 460, 76 L.Ed. 999 (1932), supra:

"There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not sub-

ject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."

Defendant relies upon seven factual claims of changed conditions since the entry of the judgment, as justification for the requested modification:

1. The share of the market of Fisher beer in the state of Utah has declined from 40.7% in 1957 to 21.6% in 1961.

2. The share of the market of Lucky Lager beer in the state of Utah has increased only from 13.5% in 1957 to 18.-2% in 1961, making the composite decline in the share of the market of Lucky Lager and Fisher from 54.2% to 39.8%.

3. This relinquishment of market did not benefit Becker, the only other Utah brewery. Its share of the Utah market declined from 16.7% in 1957 to 9.4% in 1961.

4. The share of the market relinquished by Fisher and Lucky Lager was taken over by Coors whose sale in Utah increased from 17.9% in 1957 to 33.8% in 1961. The Coors brand is now outselling all other brands in the state of Utah by a substantial margin.

5. From 1957 to 1961 Coors has increased its domination of the market in the entire intermountain area, having now 30.5% of the Nevada market, 40%

of the New Mexico market, 15.8% of the Idaho market, 55% of the Colorado market, 45.4% of the Wyoming market, and 33.8% of the Utah market; and these shares generally have been increasing.

6. Since 1957 Lucky Lager has reconstructed the Salt Lake City brewery for the purpose of increasing its competition in the intermountain area and has, in fact, entered the market in the states of Colorado and Wyoming.

7. Fisher beer brewed in Salt Lake City is being shipped into other states such as California and is there competing with other breweries and brewery combinations such as Schlitz-Burgermeister and the Maer-Regal combination.

It is argued by Lucky Lager that, therefore, it is in the public interest that the 39% limitation be removed and that in this event Lucky Lager and Fisher would be in a position to intensify competitive efforts against Coors in the state of Utah, to compete more effectively in the other intermountain states, to increase the production at the Salt Lake City brewery to the advantage of the Utah economy and thereby generally to improve Lucky Lager's ability to compete throughout the western states.

The view finally is suggested by Lucky Lager that the court might well examine the initial approval of the quota system, or at least permit its doubts about its basic propriety to weigh in favor of modification. The defendant says that the quota provision did not originate with the court but with the parties themselves, that market quotas are not favored under the antitrust laws, and that there have been unexpected practical difficulties experienced in limiting general advertising and solicitation to comply with the Utah quota; and there is arising the possible necessity of turning away customers so generally solicited.

I have no reason to question the factual foundation for the defendant's claims. Several of its arguments and conclusions, however, would appear a little sly if I did not have the utmost confidence in the good faith of defendant's counsel. The defendant agreed to the quota limitation in order to provide itself with a hedge against the alternative risk of complete divestiture. While we cannot assume, in view of the settlement without litigation, that Lucky's acquisition of Fisher was illegal, neither can we assume that it was not. But general reasons why the consent decree should not have been consented to in the first place and general arguments that Lucky Lager, Fisher, the State of Utah, or the competitive situation would be improved by a different type of judgment can be given no determinative effect, for if these are reasons why the quota system should not have been adopted and the judgment should be changed despite the agreement of the parties, a striking of the quota limitation should logically reinstate the litigation or the divestiture provision to which it was an alternative. Defendant seeks neither of these alternatives. What it wants is to be able to have the questioned acquisition of Fisher now confirmed without any limitation so that instead of a consent decree it would have the questioned acquisition in effect confirmed without running the risk of a trial but with all of the fruits of a trial in which it would completely win. If the requested cancelation of the quota provision were accomplished, the case of the Government would be substantially fruitless unless under the retained jurisdiction the court was persuaded that there should be another modification reinstating the quota provision in whole or in part. And, upon such an application by the Government, the latter, rather than the defendant, contrary to the present situation, would have the burden of proof.

The court at this stage of the proceeding has no plenary power to frame a decree which in the judgment of the respected economist who supports the defendant's motion, or of the Chamber of Commerce which also persuasively supports its position, or in its own judgment would be designed best to promote local industry or an improved competitive

situation generally. The Federal antitrust laws and the judgments entered pursuant to them by consent or after litigation limit the function of the court in determining what the public policy should be. Certainly, if such plenary power now existed the court should consider other views also including those of the other organizations in competition with Lucky Lager. No such general investigative responsibility or power is now at the disposal of the court by reason of the limited issues raised by a motion to modify a consent decree and for other reasons.

It must have been contemplated by the original consent judgment that the operations of Lucky Lager would be affected and limited to some degree more than trivially, and that other enterprises operating in Utah would secure some competitive advantage over the situation that would have existed had there been no limitations upon Lucky Lager from the operation of the decree. Neither the parties nor the court assumed to underwrite the allocation of such competitive advantages among either local Utah enterprises or enterprises represented by outside interests but lawfully doing business within the state, nor could they.

The foregoing general comments seem adequate note of the insufficiency of most of the grounds for modification relied upon by the defendant. This is not to say that changes in competitive conditions which could be generally anticipated by the operation of the decree could not have such impact in surprising degree after a substantial test period as to be regarded as a substantial change within the doctrine of United States v. Swift & Company, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), supra. Suffice it to say that the changes as shown are far from creating a condition where the defendant properly may be found to be "suffering hardships so extreme and unexpected as to justify us in saying that they are the victims of oppression".

**4.** See United States v. Swift & Company, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928), where a more serious founda-

Nor would it be proper to strike at the foundations of the consent decree by an attempted redetermination of the relevant market area upon which the judgment was founded,[4] as suggested by defendant.

Motion denied.

tional attack was rejected by the Supreme Court because the decree involved was one based upon consent.