UNITED STATES of America,
Plaintiff-Appellant-Cross
Appellee,
and
Chevron Oil Company et al., Additional
Defendants-Appellants-Cross
Appellees,

v.

Leo BURAS Jr., et al., Defendants-
Appellees-Cross Appellants,

v.

Philibert BURAS et al., Intervenors-
Appellants.

No. 31115.

United States Court of Appeals,
Fifth Circuit.

March 23, 1972.

Lawrence K. Benson, Charles D. Marshall, Wilson S. Shirley, Jr., New Orleans, La., for Chevron Oil Co. and Allen L. Lobrano.

Sidney C. Schoenberger, New Orleans, La., Luke A. Petrovich, Buras, La., for P. Buras and others.

Turner Hudson McBaine, Donald E. Peterson, San Francisco, Cal., for other appellants.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Shiro Kashiwa, Asst. Atty. Gen., Edmund D. Clark, Atty., John J. Cain, Dept. of Justice, Land Div., Washington, D. C., for the United States.

Phillip A. Wittmann, New Orleans, La., E. Drew McKinnis, Baton Rouge, La., for L. Buras and others.

John H. Tucker, Jr., Shreveport, La., for other appellees.

Before TUTTLE, GEWIN and GOLDBERG, Circuit Judges.

TUTTLE, Circuit Judge:

The dispute in this case centers around certain lands located in Plaquemines Parish, Louisiana. Essentially, this court is asked to decide between claimants who claim to take under two different chains of title. Because one of these chains leads directly to the United States Government, which is presently both a possessor and a lessor of the lands in dispute, what, at first blush, seems clearly a problem for the state courts, finds itself before a Federal tribunal. We must, however, apply Louisiana law in resolving this controversy. Having done so, we conclude that the judgment of the trial court, 332 F.Supp. 1017, should be reversed.

This suit had its beginnings in the state courts. On November 18, 1954, the heirs of Pierre Leon Buras (hereinafter referred to as the Buras heirs) brought suit in state court asserting title to the lands here in dispute. They

also sought eviction of certain mineral lessees, who had as their lessor, as stated above, the United States Government. The United States, however, then brought suit pursuant to 28 U.S.C. § 1345,[1] attempting to quiet its title and permanently enjoin the prosecution of the state court suit. To insure that all persons asserting any right or claim to the property would be before the court, the Government made its mineral lessees, Allen L. Lobrano and the heirs of Frank J. Lobrano, parties defendant (here, appellants and cross-appellants). Similarly, they also joined Chevron Oil Company and Leiter Minerals. Before dealing with the arguments raised by these parties, we briefly set forth the pertinent facts involved.

## I. FACTS

In 1894 a hunter and trapper by the name of Octave Barrois applied to the State of Louisiana for entry to certain marsh lands in Plaquemines Parish. It is unlikely that Barrois had anything more in mind than ultimately acquiring an area in which he could pursue his trade. Little did he know that in 1950–51 eight producing oil wells were to come into existence.

Barrois paid a sum of money (12½ cents an acre) to the Register of the State Land Office, John Lanier, who thereupon issued a certificate to Barrois setting forth the land description, area, and amount paid in connection with this application. Barrois pursued this application and finally received allegedly formal patents from the State of Louisiana in 1898. Both the certificate issued in 1894 as well as the 1898 patents were recorded in the official Parish conveyance records in Plaquemines Parish shortly after they were received. Soon after receiving the patents Barrois executed a deed to his brother-in-law, Pierre Leon Buras, dated January 5,

---

1. 28 U.S.C. § 1345 states:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

1899, putting in Buras' name the lands in dispute. In this deed, Barrois gave an accounting of 5,465 acres of land which he had sought to acquire, and purportedly had acquired, under these State patents. He conveyed 2,355 acres to Pierre Leon Buras for the same price per acre that Barrois paid to the State. The parties struck out the warranty clause in the printed form of the deed, however, changing it by handwriting to read "without warranty."

At this point in the narrative, it is important to emphasize that one of the central issues in this case concerns the validity of these 1898 patents. It is thus significant to note that though these State patents were recorded at the *Parish* level, they were not recorded in the State Land Office. Moreover, the money paid for these patents was, apparently, never deposited in the State Treasury. Indeed, the State Official to whom payment was made—Lanier—was not only the wrong official to deal with, as we read the statutes then in effect, but was subsequently revealed to be a rogue of the highest order. The record reveals that he was involved in a number of swindles and illicit schemes which became public knowledge only after he committed suicide in 1900.

Once Lanier's defalcations had been revealed, however, Barrois, who had been in touch with the new Register, initiated a second attempt to purchase the land in dispute. He thus paid the same purchase price once again—this time to the State Treasurer, the proper State Official—and received a new set of patents in 1903. These were duly recorded in accordance with Act 75 of 1880 in the State Land Office. Shortly thereafter, Barrois conveyed the same lands he had previously conveyed to Pierre Leon Buras to Pierre Leon's son-in-law, Augustin Buras. Appellees speculate that Pierre Leon had perhaps been offered an opportunity to, but had refused to pay a second time for the same lands and that Barrois had paid the second purchase price (which was the same as the first) and, so the assumption by appellants

goes, he thus assumed that he obtained the right to reconvey these lands. Whatever the motivation behind this second transaction, a second chain of title resulted, ultimately descending to the United States. It is the task of this court to determine which of the divergent paths leads to the true owner of this land.

In so doing, we note one additional fact. Though Pierre Leon Buras paid the taxes on these lands from 1899–1902, it is without dispute that in 1903, the year Barrois paid for the lands the second time and received the patents, neither Pierre Leon nor his successors ever paid any more taxes on the lands. However, Barrois then resumed payment of the taxes. From the time he conveyed to Augustin Buras to the present, the taxes have been paid by Augustin Buras' succeeding transferees. Moreover, we think it only fair to note that, though the Buras heirs made some inquiries as to the ownership of the lands, no contest in earnest began until 1954—over 50 years after their antecedents had stopped paying taxes and after the sale by Barrois to Augustin. This also was just three years after the land began producing oil. While such facts are of doubtful significance in light of the disposition we make of this case, we are not troubled with the thought that the result we feel Louisiana law compels us to reach is, in any way, inequitable or unduly harsh.

## II. THE VALIDITY OF THE 1898 PATENTS

We begin with a consideration of the validity of the 1898 patents. We are met at the outset, however, with the argument that patents which are valid on their face are subject to attack only under certain strictly limited circumstances. The trial court noted that the Louisiana Supreme Court, in Albritton v. Shaw, 148 La. 427, 87 So. 32, 34 (1921) established two prerequisites for such an attack:

The two prerequisites of the right of an individual to attack the validity of a land patent are: first, that the individual making the attack had an

equitable title or an inceptive right upon the land, *antedating* the issuance of the patent; and second, that the attack is aimed at the jurisdiction or legal authority of the officers of the land department to issue the patent. See, also, Smith v. Crandell, 118 La. 1052, 43 So. 699 (1907) (emphasis added).

We do not feel that the Albritton rationale controls this case. As the trial court itself noted in this regard:

" . . . none of the cases cited above involved an attack on patents which derive their presumption of validity from La.R.S. 13:3726 et seq."

And indeed, in addition to distinguishing the Albritton case, this comment by the trial court was undoubtedly made because there were no original patents before the court. They had been lost, and in order to prove them, it was necessary for the Buras heirs to follow the procedure provided for in La.R.S. 13:-3726 et seq., which reads as follows:

Where a patent for land, or the certificate of the register, or the receipt of the receiver, whether issued, or to be issued, by the officers of the State of Louisiana, or the general government has been, or may hereafter be *recorded in the office of the recorder of the parish in which the land may be situated,* (which is what had been done here) a copy of such record properly certified by the parish recorder, shall be admissible in evidence in all causes pending before any of the courts, in the same manner, and shall be entitled to the same credit as the original of such instruments, or as exemplification thereof; provided, the party proposing to use such evidence shall make affidavit that the original of such patent or certificate is not in his possession or under his control. *However, the opposite party shall be allowed to disprove the genuineness of such original or registry, as the case may be.* (emphasis added)

The only evidence of the 1898 patents offered by the Buras claimants consisted of copies of pages taken from the handwritten conveyance records of Plaquemines Parish for 1899 purporting to set forth the "patents." Though, as the statute above states these copies are admissible into evidence, an attack on the *genuineness* of that which they purport to be copies of is expressly provided for. Surely, this in itself is a significant distinguishing feature of this case from that of the Albritton variety.

■ Moreover, this case differs in another respect. Though it is true that the Government does not have any rights that antedate the 1898 patents, they are suing on the basis of patents issued in complete compliance with Louisiana law. Further, unlike the plaintiff in Albritton, the Government, its predecessors or lessees have been in actual possession of the lands in dispute ever since the issuance of the patents on which they rely. The 1898 patents are asserted *as a defense* to their action to quiet title to land they have occupied for over 50 years and as to which they had patents which are valid on their face.[2] Surely, in this posture of the case, the 1898 patents are subject to attack.

Having determined that the validity of the 1898 patents is fair game for the Government, we consider whether they stand or fall on their own merits. In so doing, we must answer two questions: (1) on whom is the burden of proof?; (3) has that burden been met?

■ The answer to the first question is readily apparent. As the trial court noted:

Since the Buras heirs have asserted title to land which is in the possession of the United States, they have the

2. It is thus the United States which comes into court and makes out its prima facie case by presenting the apparently valid patents of 1903, coupled with over fifty years of enjoyment and payment of taxes. It is the appellees who must attack the validity of the 1903 patents. This they attempt to do by showing the existence of the 1898 patents by introducing copies of the originals.

burden of proving their title. Manhattan Land and Fruit Company v. Buras, 43 F.Supp. 361, 365 (E.D.La. 1942). Cf. Arent v. Hunter, 171 La. 1059, 133 So. 157, 162–163 (1931).

The answer to the second question, however, is much more difficult to determine. Again, as the trial court noted:

They (the Buras heirs) have attempted to sustain this burden by introducing certified copies of the 1898 patents issued to Octave Barrois as they were recorded and indexed in the conveyance records of Plaquemines Parish and the deed executed by Barrois to Pierre Leon Buras, the Buras heirs' ancestor, dated January 5, 1899, which deed purported to convey to Pierre Leon Buras, without warranty, all of the lands here in dispute. The heirs also introduced the record from Plaquemines Parish of a "statement of costs" issued by Register Lanier to Octave Barrois in 1894, which shows that Barrois applied to purchase the disputed lands.

On the basis of this as well as the record before us as a whole, we conclude that the Buras heirs have simply failed to meet their burden of proof.

### III. BURDEN OF PROOF

■■ We cannot accept, even arguendo, the trial court's conclusion that the 1898 patents are presumed to be valid since they have not been judicially attacked for over fifty years. As stated above, the statute which allows the certified copies of the entry of the 1898 patents into the parish records expressly allows the originals of such copies to be subjected to any proper questioning regarding their genuineness. Thus, we feel the appellees must carry their burden without the benefit of any presumption. Since the Government contends and appellees virtually concede that regardless of where one must record his patents, the requirements for obtaining a valid patent, as stated by Act 75 of 1880, simply were not followed, we do not feel the 1898 patents can be upheld.

This Act, which both sides agree governed when the 1898 patents were issued, specifically requires that the Register keep official accounts and records of the sale of State lands and, on the sale of such lands, he is to describe them in an order to the Treasurer of the State.[3]

Moreover, it is the Treasurer who is to receive the money for these lands and, as receiver, it is this official who is to deliver to the purchaser or his agent a receipt for the payment of the money for the lands.[4] In no case is the Register to make any entry of the sale of such lands in the official records *until the receipt of the Treasurer had been submitted and filed in his office.*[5]

3. Sec. 3. *Be it further enacted,* etc., that it shall be the duty of the register to keep accounts of the sales of lands donated to the State, in well bound books, with the number of the certificate issued, therefore, setting forth the section, parts of sections, township and range, district and parish, to whom and when sold, and for what price, and shall cause to be marked on the official plats or maps on file in his office the number of certificate, which books and maps shall be preserved as official records.

4. Sec. 4. *Be it further enacted, etc.* that all money arising from the sale of warrants on public land *shall be paid by the purchaser to the State Treasurer,* on the warrant of the Auditor of Public Accounts, whose duty it shall be to warrant at once on the Treasurer of the State to receive said money within forty-eight hours after the issuance of the same by the Auditor. (emphasis added)

5. Sec. 5. *Be it further enacted, etc.,* that the Register of the State Land Office shall, on the sale of lands or warrants, describe the same in his order on the Treasurer of the State to receive the money for said lands, and in no case shall an entry be made upon the books, maps or other official record until the receipt of the Treasurer, also describing the land or warrants, has been submitted and filed in his office; a violation of this section shall be deemed a felony, and upon conviction the party offending shall pay a fine of five thousand dollars, and be imprisoned for a term not exceeding ten nor less than two years.

Finally, it was the duty of the Governor to issue patents for all lands sold *only on presentation of a Treasurer's receipt showing payment to the state for the lands in question.*[6]

As appellants note, the undisputed evidence reveals not only that the official records in the State Land Office contain *no account of any 1898 sale or "patents"* to Barrois, but also that *no money was paid to or received by the State Treasurer* for any such patents, and that the *State Treasurer never issued to Barrois or to anyone else, a receipt or certificate of purchase* showing the payment of money for the 1898 patents. In the face of this, we feel appellees could not possibly carry their burden of proof. Since the 1898 patents were not issued properly in the first instance, title did not vest in Barrois. He thus could not convey to Pierre Leon that which he did not have.

■ Appellees, however, argue that the 1880 Act does not require that the money be paid only the State Treasurer. We feel that this statute is clear on its face. They also contend, however, that Lanier was an agent of the State and as such, his failure to pay Barrois' money to the Treasurer cannot be held against them. Moreover, as the trial court noted:

The patents were recorded in the parish where the lands are located and the failure of the Register properly to record or index the patents in

the State Land Office cannot *divest* title, especially so, where as here, the heirs of innocent transferee (Pierre Leon Buras) of the patentee (Octave Barrois) are attempting to assert title.

In short, it is argued that neither the failure to pay the proper official nor that official's failure to record the patents at the State Capitol is enough to *divest* title.

To state, as the trial court has, that title "cannot be divested" implies that, at some point in time, it had become vested. Indeed, this is the underlying issue of this case. We feel that failure to comply with the explicit terms of the state statute governing the procedures for the sale of State lands is fatal to any claim that the patent is valid. Moreover, recording at the parish level, which, as the trial court itself noted, it was not necessary to do so, does nothing by way of actually vesting title in Barrois. Since we find that the only manner in which title could have vested was by complying with Act 75, the opportunity to record at the parish level was nothing more than a way of perpetuating one's evidence of title. Even this opportunity is afforded only by R.S. 13:3726, which we have quoted above. However, assuming the public records statute providing for recordation of deeds from others than the state is to be construed as comprehending recordation of State patents,[7] recording under

---

6. Sec. 14. *Be it further enacted, etc.,* that it shall be the duty of the Governor when applied to, to issue patents for all lands sold, on presentation of the Treasurer's receipt and for lands located by warrants, whenever he shall be satisfied that the same have been legally sold and located.

7. As the trial court noted:
   The public records doctrine in Louisiana emanates from the decisions for recordation contained in the Civil Code, Articles 2251–66.
   Article 2264 provides:
   "Notarial acts concerning immovables, effective date as against third persons
   2264. No notarial act concerning immovable property shall have any effect

against third persons, until the same shall have been deposited in the office of the parish recorder, or register of conveyances of the parish where such immovable property is situated."

Article 2265 provides:
   "Recordation of judicial sales, marriage contracts and judgments affecting immovables

   2265. All sales of immovable property made by any sheriff or other officer, by virtue of any execution or other order of court; all marriage contracts made within this State, tending in any wise to convey, transfer, assure or affect the estates of the parties, or being only intended to ascertain the dotal

this statute could not make valid what was invalid ab initio.

Indeed, the Supreme Court in dealing with lands granted by the United States Government had this to say:

" . . . in all Nations, as far as we know, where grants of the property of the government or of the Crown are made by written instruments, provision is made for a record of these instruments in some public government office. . . .

\* \* \* \* \* \*

The Acts of Congress provide for the record of all patents for land in an office, and in books kept for that purpose. An officer, called the Recorder, is appointed by law to make and to keep these records. This officer is required to record every patent before it is issued, and to countersign the instrument to be delivered to the grantee. This, then, is the final record of the transaction, the legally appointed act which completes what Sir William Blackstone calls title by record; and *when this is done, the grantee is invested with that title.* United States v. Schurz, 102 U.S. 378, 402–403, 26 L.Ed. 167 (1880)."

We adopt a similar approach in holding that the grantee, Barrois, never was invested with title due to his failure to comply with the governing Act in force at that time.

There are important reasons for requiring strict adherence to such statutes as are involved in this case. In addition to ensuring the orderly administration of such governmental transactions, the procedural protections built into these statutes guard against careless, fraudulent or unscrupulous governmental officials. Requiring, for example, that money be paid to a particular individual who must give a receipt and be held accountable for all monies received is for the protection of the public at large as well as the individual purchaser involved. Of course, had Act 75 been complied with in the case at bar, what is now being complained of would never have come to pass.[8]

To hold that in failing to follow the statute, the purchaser, in effect, was able to designate the unscrupulous Register as an agent of the State rather than an agent of the purchaser, himself, would, we feel, undermine the purpose and significantly frustrate the salutary effects of the Act involved. See generally, Matthews v. Zane, 20 U.S. (7 Wheat.) 164, 205, 5 L.Ed. 425 (1822); Polk's Lessee v. Wendal, 13 U.S. (9 Cranch) 87, 3 L.Ed. 665 (1815); Saltenberry v. Loucks, 8 La.Ann. 95 (1853); Broussard v. Broussard, 43 La.Ann. 921, 9 So. 910 (1891); Hood v. Martin, 11 La.Ann. 552 (1856).

In short, we do not feel that appellees have proved the validity of the 1898 patents. Though they contend that they are valid on their face, we note that there is some question as to whether the signature on those patents was that of the Governor. Even if we assume the patents were validly signed by the Gov-

rights of the wife, or that her marriage portion is liable to some reserves, or stipulated to be paraphernal or extradotal property; and all final judgments affecting immovable property shall be recorded in the parish where the immovable property is situated."

Article 2266 provides:

"Effectiveness of unrecorded acts affecting immovables; effect of subsequent recordation

2266. All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.

The recording shall have effect from the time when the act is deposited in the proper office, and indorsed by the proper officer."

8. Indeed, the seriousness which the State of Louisiana attached to the precise requirements relating to payment to the Treasurer is indicated by the criminal sanctions to be involved for failure to comply. Such violation was a felony punishable by a $5,000 fine and imprisonment for a maximum of 10 years.
See quoted sections in footnote 4, supra.

ernor, an issue which the jury could not resolve,[9] we do not feel that that alone proves the validity of these patents. If his signature was affixed without benefit of the Treasurer's receipt and without any entry of this transaction in the State record books, it was not in compliance with the governing law and therefore could not cure the defects which existed in these patents.

## IV. THE DOCTRINE OF AFTER-ACQUIRED TITLE

■ Appellees argue, in the alternative, that even if we find the 1898 patents to be invalid, which we do, they are entitled to take under the 1903 patents by reason of the doctrine of after-acquired title. The argument is that if Barrois executed a deed to Pierre Leon Buras to lands which he did not own, as we have held, then when he later acquired them, title would pass under the earlier deed. This Court's en banc decision in Butler v. Bazemore, 303 F.2d 188 (5th Cir. 1962) controls this issue. In that opinion this Court stated that:

> The doctrine of after-acquired title applies only to a vendee holding by a *warranty deed* . . . " Id. at 194 (emphasis added)

It is beyond dispute that the conveyance from Octave Barrois to Pierre Leon Buras expressly excluded warranty. As appellants point out, the instrument was executed on a printed form of deed which stated "with full and general warranty of title." The parties, however, struck out "full and general" and by interlineation changed the word "with" to "without". This express exclusion, we feel, brings this case within the ambit of Butler.

Appellees, however, contend that the Butler case simply held that in a sale which was silent as to warranty, a warranty will be implied pursuant to Civil Code Article 2501. The Court's generalization that the parties could have avoided that result by an "express exclusion of warranty" was dictum. They note that Article 2505 of the Civil Code provides:

> Even in case of stipulation of no warranty, the seller, in case of eviction, is liable to a restitution of the price, unless the buyer was aware, at the time of the sale, of the danger of the eviction, and purchased at his peril and risk.

On the basis of this section, they argue that the Court must determine whether or not the purchaser was aware of the danger of eviction. If not, as they note in the case at bar, warranty still exists as to the return of the purchase price and, they contend, after acquired title would apply.

We disagree. To say that even without warranty, an unsuspecting vendee may be entitled to a return of his purchase price is a far cry from saying the vendee is entitled to title as well. Once a vendee agreed to accept a no warranty deed, he accepts the risks that go with it. We feel the clear implication of Bazemore v. Butler is that after-ac-

---

9. The trial court submitted the following interrogatory to the jury:
   Did the Governor of Louisiana sign the 1898 patents to Octave Barrois in this case?
   The jury could not agree on the answer. The trial judge ruled that this was a question of law and resolved the issue by holding, in effect, that the Governor did sign these patents.
   In so doing, the trial court was apparently working under the assumption that there is a presumption that the Governor has performed his ministerial duty. Indeed, the court cited the following from a Fifth Circuit case:

When it is determined that an entryman or purchaser of public lands *has done all that is required of him*, and the land is subject to entry or sale, the issuance of the patent is a mere ministerial act even though the ascertainment of the necessary prerequisites requires an administrative determination. Laterre Co., Inc. v. Billiots Shell Island, 103 F.2d 53 (5th Cir. 1939) (emphasis added).
We do not disagree with this proposition. What we hold, however, is that prior to issuance of the patent it has not been adequately proved that "all that is required" of the purchaser had been done.

quired title does not apply when warranty is expressly excluded.

Because of the disposition we make of this case, it is not necessary to reach the issues raised by the intervenors. The judgment of the trial court is reversed, and the case is remanded to the trial court for entry of judgment quieting title to these lands in the United States.

Reversed with directions.