UNITED STATES of America, Plaintiff-Appellant-Cross-Appellee, and Chevron Oil Company et al., Additional Defendants-Appellants-Cross-Appellees,

v.

Leo BURAS, Jr., et al., Defendants (1–26)-Appellees-Cross-Appellants,

v.

Philibert BURAS et al., Intervenors-Appellants.

No. 31115.

United States Court of Appeals, Fifth Circuit.

Dec. 26, 1972.

Lawrence K. Benson, Charles D. Marshall, Wilson S. Shirley, Jr., Sidney C. Schoenberger, New Orleans, La., Luke A. Petrovich, Buras, La., Turner Hudson McBaine, Donald E. Peterson, San Francisco, Cal., Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Shiro Kashiwa, Asst. Atty. Gen., Edmund D. Clark, John J. Cain, Attys., Dept. of Justice, Land Div., Washington, D. C., for appellants.

Phillip A. Wittmann, New Orleans, La., E. Drew McKinnis, Baton Rouge, La., S. W. Plauche, Jr., Lake Charles, La., John H. Tucker, Jr., Shreveport, La., for appellees.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

(Opinion March 23, 1972, 5th Cir., 1972, 458 F.2d 346).

Before TUTTLE, GEWIN and GOLDBERG, Circuit Judges.

PER CURIAM:

The Petition for Rehearing and motion to file supplementary petition for rehearing are hereby denied and the Court having been polled at the request of one

---

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409.

of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for rehearing En Banc is also denied.

Before JOHN R. BROWN, Chief Judge, and TUTTLE, WISDOM,* GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge (dissenting):

With all due deference to the conscientious and scholarly approach of the panel to the intricate analysis of Louisiana land law required by this decision, I respectfully dissent from the Court's denial of rehearing en banc.

I do not begin to offer even a faint whisper of a suggestion of possible criticism of the panel's decision on the *merits* of the competing claims. Indeed, it is that the *merits* are inescapably shrouded in ancient history, Louisiana practices in the administration of state land patent grants, and the intricacies of Louisiana law and procedure, that makes it imperative that these difficult questions be certified to the Supreme Court of Louisiana for a determination which will have both authoritativeness and finality. Since the panel acted without so much as mentioning either the strong showing for or the present statutory availability of such certification, the only way for this to be accomplished at this level is for us to grant rehearing en banc and then order such certification.

Although I avoid the merits as such, they are important in my approach. To

reach its decision that certain patents granted by the State of Louisiana in 1898 to Octave Barrois were invalid under the then applicable Louisiana law, the panel had to first leap the purposefully erected hurdle of Albritton v. Shaw, 1921, 148 La. 427, 87 So. 32—a Louisiana Supreme Court opinion of long and unquestioned validity. To propel it over this formidable bulwark the panel had to reach a now severely attacked construction of a Louisiana evidentiary statute. Having surmounted the procedural obstacles in its course, the Court then had to proceed to explicate the now-ancient Louisiana land patent law and to delineate the scope of the Louisiana version of the cryptic doctrine of after-acquired title.

Given the complicated and unique nature of these substantive and procedural questions of Louisiana land law, the panel's decision could have been no more than a guess—albeit an educated one. I, for one, quickly concede my inability to accurately expound on the occult peculiarities of Louisiana land law, as witnessed by my self-confessing concurrence in the 1960 en banc opinion, Butler v. Bazemore, 5 Cir., 1962, 303 F.2d 188, overruling my earlier 1957 effort for the panel in Bazemore v. Whittington, 5 Cir., 1957, 245 F.2d 943.

Of course I recognize that under Article III we do have the duty to decide even the most abstruse matters—even in diversity cases where there is no readily available means to secure authoritative state decisions except in the really important rare cases.[1] But where there is a method and the case is vital to state interests, it is the part of judicial statesmanship[2] to exploit such procedures fully.

---

* Judge Wisdom did not participate in this cause.

1. Although as note 9, *infra*, reflects, we have frequently used the Florida certification procedure with great success, the device is reserved for important cases involving Florida public policy. Literally hundreds of run-of-the-mill Florida diversity cases have routinely been handled by panels of the Court.

Beleaguered as we are by an exponential docket increase, we have not allowed certification to become an escape or abdication.

2. In some ways, this same policy is reflected in our deference toward the views of the District Judge steeped as he is in

The true pith of this litigation concerns the legal allocation of one of Louisiana's most treasured natural resources —her gas and oil. The State of Louisiana, not just private litigants, has repeatedly sounded the state policy of exploiting and preserving her oil and gas reserves,[3] and she continues to do so.[4]

local law, lore and legend. Judge Gewin recently recognized this:

> Judge Borah was a former Louisiana practitioner as was the district judge in this case before being appointed to a federal district judgeship in that state. Although we certainly do not base our decision in this case solely upon the expertise of other judges merely because complex questions of state law are involved, their personal acquaintance with the state law is a factor which weighs in favor of their conclusion as to state law. Such consideration is particularly appropriate where as here the state law is unclear and ambiguous.

Tardan v. Chevron Oil Co., 5 Cir., 1972, 463 F.2d 651, 652 [1972].

This is especially significant here where the panel comprising no Louisiana trained Judges rejects the conclusions of Judge Christenberry, a long-time Louisiana practitioner and federal trial judge.

3. Its importance was recognized by the Supreme Court in FPC v. Louisiana Power and Light Co., 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369, by its quotation from the state's amicus brief:

> "12. The conflict between producing and consuming States over state or federal regulatory authority is highlighted in the contrast between Louisiana's amicus brief in this case and the statement of the Chairman of the New York Public Service Commission in another case. Louisiana, a producing State, submits:

> "Historically, gas producing states have certain advantages over states which do not have their own gas supply. Their very proximity to the source of production attracts industries which use gas as the raw material without which their plants could not operate. The lower transporation costs of delivering gas to other industrial and commercial users within the state makes its use particularly attractive for such applications. It is not surprising, therefore, that producing states have a higher proportion of industrial-commercial consumption of total gas consumed and of firm gas than consuming states. Louisiana utilizes 84% of the total quantity of firm gas sold in the state for industrial and power plant generation purposes, in comparison to a national average of only 37%.

> "Louisiana's economy is heavily dependent upon the availability of a firm, reliable and uninterrupted supply of natural gas. State-wide investment by industrial category clearly reflects the predominance of petroleum, refineries and chemicals which represented $465,297,370 or 76% of a total industrial investment of $609,578,850 in 1970. Apart from these industries which use natural gas as process gas without which their plants cannot function, the state's electric utilities are completely dependent upon natural gas as fuel for electric generators.

> "Thus, the economic welfare of the state hinges upon the continued delivery of the volumes of gas it received and used prior to United's curtailment and upon the ability to draw upon greater volumes. Otherwise, its economy will be frozen at or below its present level. This is not true of other states in which natural gas plays a subsidiary rather than a dominant role in the overall economy of the state and in which the electrical utilities have alternate power sources such as coal, imported liquefied natural gas and inexpensive hydroelectric power." Brief of State of Louisiana Amicus Curiae pp 2–3."

Id. at 633 n. 12, 92 S.Ct. at 1835 n. 12, 32 L.Ed.2d at 381 n. 12.

4. The same information, data and policy were put forward in the state's brief more recently in Louisiana v. FPC, 5 Cir., 1973, 476 F.2d 140 [No. 72–1220, argued September 27, 1972, Atlanta, Georgia], and emphasized by counsel's oral argument to this Court:

> "We are here to discuss heat and power. Heat and power that is essential to the economic welfare of the State of Louisiana. We hope to do it with light.

> "Louisiana is the largest gas-exporting state in the federal union. It is the second largest gas-producing state in the nation. It delivers to other states that cannot supply their own gas supplies 48 percent of all natural gas exported by producing states to states that cannot meet their own needs.

> *      *      *      *      *

> "Now plainly, we submit to Your Honors, Louisiana contributes more than its fair share to the national pool of natural gas.

> *      *      *      *      *

But oil and gas in Louisiana (and the oil-rich, off-shore reserves) is important not only to Louisiana. It is important to the United States, as witnessed by this very case and the important earlier one, Leiter Minerals, Inc. v. United States, 1957, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267. With both protagonists

being sovereigns of equal standing and asserting claims over these rich stakes on the basis of Louisiana domestic law, the demands of a healthy federalism make it more than ordinarily appropriate that the underlying questions of state law be resolved by the only Court which can give an authoritative [5] answer—the Su-

"Now Louisiana is a producing state. It did not choose to become a producing state. It did not choose to have a wasting asset as its major natural resource. It would prefer to have capital that it could invest and have come back with increases in earnings."
Transcript of Oral Argument at 45–46.

5. Of course an *Erie*-based judgment of this Court or on certiorari by the Supreme Court is authoritative in the sense that it determines the cause and constitutes *res judicata* or collateral estoppel as to the parties. But its *stare decisis* effect is entirely within the control of the Supreme Court of Louisiana under its power to alter, modify or reverse its prior holdings on which the *Erie*-bound federal court has acted. And perhaps even more important, without changing its law it may, as have many of the Supreme Courts within this Circuit, *reject* the reading which the Fifth Circuit has given to the pertinent state law. See, e. g., Truck Ins. Exchange v. Seelbach, 1960, 161 Tex. 250, 339 S.W.2d 521, expressly rejecting National Surety Corp. v. Bellah, 5 Cir., 1957, 245 F.2d 936; Food Fair Stores, Inc. v. Trusell, Fla., 1961, 131 So.2d 730, expressly disapproving Pogue v. Great Atlantic & Pacific Tea Co., 5 Cir., 1957, 242 F.2d 575.

I exposed this fact in my 1967 dissent in W. S. Ranch Co. v. Kaiser Steel Corporation, 10 Cir., 1967, 388 F.2d 257:
"To me the sound approach continues to be the one reflected in the unreversed action of the Court in *Delaney*.[7] And experience since that time continues to bear out the strong note sounded by the concurring opinion [8] that real injustice is done to litigants and, worse, more damage is done to the states' jurisprudence and its policies by a headstrong, resolute, inflexible determination on the part of a federal court to barge ahead in a sort of ascetic, misguided [Meredith v.] *Winter Haven* [, 320 U.S. 228, 64 S.Ct. 7, 88 L. Ed. 9] impulse, than will likely result from the slight delay occasioned by invoking state adjudication of the controlling issues.[9] For the simple fact is that more and more,[10] more federal courts are being overruled by more state courts on local issues upon which such federal

courts have undertaken to read the *Erie* signs in the quest of the *Winter Haven* grail.

Texas, for example, continues on its path of independence in a number of instances [11] not the least of which was the Fifth Circuit's *Delaney* prediction itself.[12] But, this is not an infirmity of the Fifth Circuit alone.[13] And the experience in Florida demonstrates that state court reversals of Federal appellate decisions occur both in appeals of state cases [14] and on *Clay* certification (see note 5 supra) to the Supreme Court of Florida, the latter with some spectacular results.[15]

7. United Services Life Ins. Co. v. Delaney, 5 Cir., 328 F.2d 483 (en banc), cert. denied, [Paul Revere Life Ins. Co. v. First Nat. Bank in Dallas,] 1964, 377 U.S. 935, 84 S.Ct. 1335, 12 L.Ed.2d 298, on motion for rehearing en banc, 5 Cir., 358 F.2d 714, cert. denied, 1966, 385 U.S. 846, 87 S.Ct. 39, 17 L.Ed.2d 77.

8. See United Services Life Ins. Co. v. Delaney, supra, 328 F.2d at 485 (concurring opinion). The *Delaney* abstention procedure and the justification for it sought to be articulated by the concurring opinion have come in for some spirited criticism. See Agata, Delaney, Diversity, and Delay: Abstention or Abdication?, 4 Houston L.Rev. 422 (1966) (Special Fifth Circuit Issue).

9. Subsequent *Delaney* judicial events in neither the Texas State Courts nor the Fifth Circuit (traced in note 5, Aetna Life Ins. Co. v. Barnes, 5 Cir., 1966, 361 F.2d 685, 687) prove that when employed with a little enlightened resourcefulness on on the part of either counsel, trial court, or appellate court the *Delaney* abstention is unworkable or administratively unsound. It is safe to say that no one on the Fifth Circuit, majority or dissenting, entertained for the briefest fraction of a possible division of a moment the idea that on recourse to the state courts after remand either counsel or the Texas courts would suppose that the single

**1374**

preme Court of Louisiana. Indeed, the United States Supreme Court in the context of this struggle between sovereign giants has itself recognized the desirability of having Louisiana courts construe Louisiana law. Recognizing, as we must do here, that any federal construction of Louisiana law would be law only until an authoritative judgment by the Louisiana Supreme Court is rendered, the Court has expressed the following thoughts:

The answers to these questions [of state law] are or may be relevant. Before attempting to answer them and

critical issue be excised for a sort of law-school academic inquiry in the declaratory judgment proceeding.

10. In the score sheet which follows (notes 11, 12, 13 and 14 infra), I do not repeat the cases documented in *Delaney.*

11. See, e. g., Felmont Oil Corp. v. Pan American Pet. Corp., Tex.Civ. App., 1960, 334 S.W.2d 449, error ref'd n. r. e., which expressly refuses to follow Sinclair Oil & Gas Co. v. Masterson, 5 Cir., 1959, 271 F.2d 310; see E. Brown, Law of Oil & Gas Leases, 1958: 1966 Cumulative Supplement, p. 293; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, 102 n. 57.

12. Prof. Agata points this out "Additionally and ironically, Judge Brown can now add *Delaney* to the list of wrong guesses. Concluding that 'judicial statesmanship of the highest and proper order' dictated permitting Texas courts to decide the legal issue, and noting that Texas 'has a judicial system which will permit adjudication with dispatch and speed' and 'with its full arsenal of procedural devices * * * will enable the parties to have a prompt and completely sufficient determination,' Judge Brown and his colleagues had again failed to anticipate the state court ruling. Texas refused to hear the case." (Citing United Services Life Ins. Co. v. Delaney, Tex.Civ. App., 386 S.W.2d 648, aff'd., Tex., 1965, 396 S.W.2d 855). Agata, supra note 8, at 424.

13. See Yarrington v. Thornburg, Del., 1964, 205 A.2d 1, 11 A.L.R.3d 1110, rejecting Truitt v. Gaines, D. Del., 1961, 199 F.Supp. 143; Travelers Ins. Co. v. Auto-Owners (Mut.) Ins. Co., 1964, 1 Ohio App.2d 65, 203 N.E.2d 846, rejecting American Fid. & Cas. Co. v. Indemnity Ins. Co. of North America, 6 Cir., 1962, 308 F.2d 697; Kelly v. State Auto Ins. Ass'n, 6 Cir., 1961, 288 F.2d 734, and Travelers Ins. Co. v. Ohio Farmers Indem. Co., 6 Cir., 1958, 262 F.2d 132.

14. Weed v. Bilbrey, Fla.App., 2d Dist., 1967, 201 So.2d 771, rejecting outright Emerson v. Holloway Con-crete Prods. Co., 5 Cir., 1960, 282 F. 2d 271, cert. denied, 1961, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372, and expressly adopting the dissent of Brown, J. in the *Emerson* case, 282 F.2d at 278.

15. See, e. g., Life Ins. Co. of Va. v. Shifflet, 5 Cir., 1966, 359 F.2d 501, upholding a jury verdict against the insurance company under the construction of the Florida Insurance Statutes on fraudulent misrepresentation. But then see, 5 Cir., 1967, 370 F.2d 555, granting a motion for rehearing and certifying the question to the Supreme Court of Florida, which in Life Ins. Co. of Va. v. Shifflet, Fla., 1967, 201 So.2d 715, reached a result opposite from the one reached in the original Fifth Circuit opinion. On receipt of the answer to the certified question, the Fifth Circuit vacated the earlier judgment and remanded the case to the district court. See 380 F.2d 375.

And see especially Hopkins v. Lockheed Aircraft Corp., 5 Cir., 1966, 358 F.2d 347 in which the Court certified to the Supreme Court of Florida the controlling question of the dollar limitation on damages for wrongful death, a problem presenting fundamental and serious questions of state policy with only fragmentary case materials with which to work. The determination of the question was so difficult, not only for the Federal Court in the light of intervening developments in the law of conflicts but also for the Supreme Court of Florida, that it resulted actually in two opinions before the question was settled. See the opinion at 201 So.2d 743 holding that the situs state dollar limitation was contrary to Florida policy and the opinion at 201 So.2d 749 where, on rehearing, the Court reversed itself to validate the Illinois recovery limitation. No amount of prescience, including that thought by some to come from a Federal Commission, enables a non-Florida Judge authoritatively to determine Florida policy."

388 F.2d 264–265 (original footnotes retained). Since *Kaiser Steel* the list has continued to grow.

to decide their relation to the issues in the case, we think it advisable to have an interpretation, if possible, of the state statute by the only court that can interpret the statute with finality, the Louisiana Supreme Court.

Leiter Minerals, Inc. v. United States, *supra*, 352 U.S. at 229, 77 S.Ct. at 292, 1 L.Ed.2d at 267.

And, putting its words into action, the Supreme Court in *Leiter* required the federal court to stay its hand pending resolution of the State law via a separate proceeding to be brought in state court under the Louisiana declaratory judgment statute.[6]

Louisiana's claim to determine domestic legal principles bearing on the allocation and ownership of her oil and gas is no less a matter of great public policy than was the claim of the state of New Mexico to adjudicate cases and controversies involving her precious natural resource—water. See W. S. Ranch Co. v. Kaiser Steel Corporation, 10 Cir., 1967, 388 F.2d 257, 262–267 in which, as a dissenter on the petition for rehearing, I urged the Tenth Circuit, as I now do the Fifth, to give way to the courts of New Mexico. Following the reversal by the Supreme Court, 1968, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835, the Supreme Court of New Mexico expressly rejected the Tenth Circuit's determination, 388 F. 2d 257, of the decisive question of local law. See Kaiser Steel Corporation v. W. S. Ranch Co., 1970, 81 N.M. 414, 467 P. 2d 986.

Fortunately for Louisiana, there is no longer a need to strain at parallel declaratory judgment proceedings as in *Leiter* or *Kaiser Steel, supra*. For Louisiana has recently adopted the now available, effective procedure which permits a federal appellate court to certify questions of state law to the Louisiana Supreme Court.[7] Thus, the objective of an authoritative determination with finality can be attained with significantly reduced logistical problems.

In these times when comity and abstention have become the by-line for Federal Judges,[8] it is unfortunate that the Fifth Circuit adopts this head-in-the-sand rejection of the State's effort to alleviate our *Erie* burden. Our wide experience with certification to the Florida Supreme Court has not only proved its utility in sparing this Court—and more importantly, the litigants—the risk of a wrong decision,[9] but it has recently evoked a most favorable response from that tribunal. See National Education As-

6. With a like recognition of deference due a sovereign the Supreme Court of Louisiana proceeded to determine the case even though it was much concerned whether it was rendering what would, under its jurisprudence, be an impermissible advisory opinion. See Leiter Minerals v. California Co., 1961, 241 La. 915, 132 So.2d 845.

7. Act 84 of 1972, Louisiana Legislature.

8. See Leiter Minerals, supra; Kaiser Steel, supra; and the famed February Sextet: Younger v. Harris, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669; Samuels v. Mackell, 1971, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688; Boyle v. Landry, 1971, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696; Perez v. Ledesma, 1971, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701; Dyson v. Stein, 1971, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781; Byrne v. Karalexis, 1971, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792.

9. It started with Clay v. Sun Ins. Office, Ltd., 1960, 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170, on certification upon remand, Fla., 1961, 133 So.2d 735, on receipt of answers to certification, 5 Cir., 1963, 319 F.2d 505, reversed, 1964, 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229.

Thereafter we have used it frequently. See, Gordon v. John Deere Company, 5 Cir., 1971, 451 F.2d 234, on certification, Fla., 1972, 264 So.2d 419 (1972), on receipt of answers to the certification, 5 Cir., 1972, 466 F.2d 1200 (1972); National Education Association, Inc. v. Lee County Board of Public Instruction, 5 Cir., 1971, 448 F.2d 451, on certification, Fla., 1972, 260 So.2d 206, on receipt of answers to certification, 5 Cir., 467 F.2d 447; Allen v. Estate of Carman, 5 Cir., 1971, 446 F.2d 1276; Boyd v. Bowman, 5 Cir., 1971, 443 F.2d 848, on certification, Fla., 1971, 256 So.2d 1 (1971); A. R. Moyer, Inc. v. Graham, 5 Cir., 1971, 443 F.2d 434; Martinez v. Rodriguez, 5

sociation, Inc. v. Lee County Board of Public Construction, Fla.1972, 260 So. 2d 206.

Believing that certification of the questions of state law in this case would foster the ends of federalism and contribute immeasurably to the correct interpretation of Louisiana law,[10] I would grant rehearing en banc and certify the difficult questions of state law to the Louisiana Supreme Court.

I therefore dissent to the failure of the Court to grant rehearing en banc.

INGRAHAM, Circuit Judge, with whom CLARK, Circuit Judge, joins specially concurring:

While I am in agreement with the panel opinion in United States v. Buras, 458 F.2d 346 (5 Cir., 1972), believe that it correctly analyzes and interprets the law on the subject, and voted against en banc review, I am in accord with Chief Judge Brown's efforts to certify the questions of state law to the Louisiana Supreme Court if it is feasible to do so.

Cir., 1968, 394 F.2d 156, on certification, Fla., 1968, 215 So.2d 305, on receipt of answers to certification, 5 Cir., 1969, 410 F.2d 729; Life Ins. Co. of Va. v. Shifflet, 5 Cir., 1967, 370 F.2d 555, on certification, Fla., 1967, 201 So.2d 715, on receipt of answers to certification, 5 Cir., 1967, 380 F.2d 375; Hopkins v. Lockheed Aircraft Corp., 5 Cir., 1966, 358 F.2d 347, on certification, Fla., 1967, 201 So. 2d 743, on receipt of answers to certification, 5 Cir., 1968, 394 F.2d 656; Green v. American Tobacco Co., 5 Cir., 1962, 304 F.2d 70, on rehearing 304 F.2d 85, on certification, Fla., 1963, 154 So.2d 169, on receipt of answers to certification, 5 Cir., 1963, 325 F.2d 673, cert. denied, 1964, 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306, on appeal after retrial, 391 F.2d 97, rev'd on rehearing en banc, 1969, 409 F.2d 1166.

10. On numerous times, separate panels of our Court have expressed their yearning for a Florida-type certification procedure to resolve unsettled points of pure state law. E. g., Lee v. Great Northern Nekoosa Corp., 5 Cir., 465 F.2d 1132, n. 1 [1972]:

    We regret our inability to certify the questions to the Supreme Court of Ala-

bama for its authoritative resolution as would be possible if the case involved Florida law. Section 25.031, Florida Statutes Annotated as implemented by Rule 4.61 of the Florida Appellate Rules, 32 F.S.A. See Clay v. Sun Insurance Office, [Ltd.], 1960, 363 U.S. 207, 212, 80 S.Ct. 1222, 4 L.Ed.2d 1170.

    Our efforts to do this in Texas were aborted by the Supreme Court of Texas because it concluded the partial declaratory proceeding would constitute an advisory opinion. See United Services Life Ins. Co. v. Delaney, 5 Cir., 1964, 328 F. 2d 483 (en banc) (abstaining), dismissed, Tex., 1965, 396 S.W.2d 855, decided, 5 Cir., 1966, 358 F.2d 714. See, generally, Agata, Delaney, Diversity, and Delay: Abstention or Abdication?, 4 Hou.L.Rev. 422 (1966); Gowen and Izlar, Federal Court Abstention in Diversity of Citizenship Litigation, 43 Tex.L.Rev. 194 (1964); Comment, Abstention under Delaney: A Current Appraisal, 49 Tex. L.Rev. 247 (1971). In order to allow the State of Texas to construe her own law, we must, under the current view, dismiss the federal litigation. Barrett v. Atlantic Richfield Co., 5 Cir., 1971, 444 F. 2d 38.