**UNITED STATES of America**
**v.**
**UNITED SHOE MACHINERY CORPORATION.**

Civ. A. No. 7198.

United States District Court
D. Massachusetts.
April 11, 1967.
As Corrected April 18, 1967.

Margaret H. Brass, W. Randolph Elliott, Robert J. Ludwig, Washington, D. C., Sp. Attys. for the United States, (Donald F. Turner, Asst. Atty. Gen., and Paul F. Markham, U. S. Dist. Atty.) for plaintiff.

Ralph M. Carson, New York City, Robert Proctor, Boston, Mass., Taggart Whipple, Louis L. Stanton, Jr., New York City, Robert D. Salinger, Boston, Mass., Davis, Polk, Wardwell, Suderland & Kiendl, of New York City, Choate, Hall & Stewart, Boston, Mass., Carter, Ledyard & Milburn, New York City, for defendant.

Thomas F. Shannon, James F. Rill, Andrew E. Zelman, Washington, D. C., for amicus curiae, National Footwear Manufacturers Association, of counsel, Collier, Shannon & Rill, Washington, D. C., Benjamin A. Trustman, John R. Hally, Boston, Mass. (of Nutter, McClennen & Fish, Boston, Mass.), amicus curiae, New England Footwear Manufacturers Association, Inc.

## OPINION

WYZANSKI, Chief Judge.

The Government and United Shoe Machinery Corporation have each filed a petition for modification of this Court's decree of February 18, 1953, affirmed by the Supreme Court of the United States May 17, 1954, and subsequently modified July 12 and September 17, 1954. See United States v. United Shoe Machinery Corp., 110 F.Supp. 295 (D.Mass.), aff'd United Shoe Machinery Corp. v. United States, 347 U.S. 521, 74 S.Ct. 699, 98 L. Ed. 910.

The Government's petition seeks to have United dissolved into two companies. United seeks to have the restrictions now imposed limited to requirements of sale of any machine types offered for lease, maintenance of a reasonable commercial relationship between sale terms and lease terms, separate charges for service, and avoidance of restrictive clauses such as the full capacity clause. Both petitions rely upon the following language in paragraph 18 of the decree:

"On C Day [December 23, 1964] both parties shall report to this Court the effect of this decree, and may then petition for its modification, in view of its effect in establishing workable competition. If either party takes advantage of this paragraph by filing a petition, each such petition shall be accompanied by affidavits setting forth the then structure of the shoe machinery market and defendant's power within that market."

 Threshold questions are what is the scope of this Court's power in these proceedings, what standards are to be applied in the exercise of this power, and what issues are before this Court. With respect to the first two questions an authoritative answer is given by United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. A court can modify a continuing injunction not on the basis of conditions that existed at its making, but only on the basis of new and unforeseen conditions. Moreover, the court should require a clear showing of grievous wrong. In *Swift,* where the Supreme Court denied a defendant's application to have a decree modified, it enunciated the criteria in the following words (286 U.S. at p. 119, 52 S.Ct. p. 464) applicable *mutatis mutandis* to a plaintiff's application:

"There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but

they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."

*Swift* has been followed consistently. Morse-Starrett Products Co. v. Steccone, 205 F.2d 244 (9th Cir.); Bigelow v. Twentieth Century-Fox Film Corp., 183 F.2d 60 (7th Cir.); United States v. Lucky Lager Brewing Co. of San Francisco, 209 F.Supp. 665 (D.Utah).

Nothing in paragraph 18 of the decree departs from *Swift's* teaching or purports to confer upon this Court a broader power to alter its decree, or authority to apply different standards. The requirements remain (1) a clear showing of (2) grievous wrong (3) evoked by new and unforeseen conditions. Indeed if paragraph 18 gave this Court the power to alter a decree on any lesser showing the decree would not have been final and appealable to the Supreme Court.

What paragraph 18 does is to direct the parties to an issue: the decree's "effect in establishing workable competition" the phrase was unfortunate because it has no precise legal meaning. But if paragraph 18 be read against the accompanying opinion, United States v. United Shoe Machinery Corp., D.C., 110 F.Supp. 295, it is apparent that what the Court was inviting was information as to how successful the decree had been in gradually eroding United's 1953 power to monopolize the market. The opinion makes it plain that the object of the decree was during a ten year period not to restore so-called workable competition but to move toward establishing it.

The issue now raised requires that this Court first state what it knew at the time of the decree and what it then chose.

The following were among the facts of which this Court was aware in 1953. United had by far the largest financial and patent resources in the shoe machinery industry. It was the only company that offered a wide line of machine types. If United were allowed to continue leasing, even on a basis that gave shoe factories an alternative to purchase the leased machine at an equivalent price, almost all shoe factories would prefer to lease their new and more complicated machines. That preference would enable United to continue its visits to most shoe factories. It would permit United to place machines on lease on an experimental basis. It should make it difficult for any competitor to succeed in connection with the marketing of complicated expensive types of machinery for which there was a thin market unless the competitor had resources adequate to offer a long line of machine types, to accept compensation in the deferred form of rental payments, to make its lease terms the commercial equivalent of its sale terms, and to withstand the at least temporary inconvenience of having leased machines returned after a short rental period. In short, this Court was quite cognizant of the fact that permitting United to continue as a single enterprise engaged predominantly in leasing rather than selling made it almost certain that at the end of a decade, absent a strong outside challenger, United's market power would be merely diminished not destroyed.

Yet this Court chose not to dissolve United, and not to prohibit leasing, but merely to purge the leases of certain specific restrictive clauses, to require United to offer lessees the alternative of purchasing, and to require United to take certain miscellaneous steps which need not now be recited. Among the reasons that this Court made this choice were that the Supreme Court had approved the constitution of United as a single enterprise, that it had permitted United to proceed with leasing as an exclusive method of distributing machines, that United had engaged in no predatory or immoral practices, and that United owed much of its position to superior products and services, to its own inventions, and to other results of United's skill, ability, and efficiency.

Both parties have submitted requests for findings. They have been helpful in

directing this Court's attention to what the decree has accomplished, to what are the dynamics of the 1963–1964 [hereafter sometimes called "the present"] shoe machinery market, to the freedom of choice now enjoyed by the shoe factory users of shoe machinery, and to the freedom of competitors in the present market structure. But those topics need not be covered by this Court in detail and hence, so far as not granted herein, all requests for findings are denied.

Paragraph 18 of the decree by referring to affidavits indicated that this would be a summary proceeding. It is important not to plague anti-trust law by establishing a precedent which might lead to full scale second trials of anti-trust cases on every claim that, as shown by its effects, an outstanding decree was too lenient or too severe. The only findings which this Court deems appropriate and necessary follow in numbered paragraphs.

1. United complied fully with this Court's decree.

2. Before the 1953 decree United's share of the shoe machinery market by any measure was about 85 per cent. While in 1953 there was no specific finding with respect to United's then share of the revenue from shoe machinery sold and leased, it is a fair inference that, because of its strong position in the distribution of major machines yielding the largest revenue, United's share of the total revenue exceeded 85 per cent. In 1963 it had declined to about 62 per cent of the current shoe machinery market.

3. That market now includes machines for the manufacture of vulcanized rubber footwear because such machines are competitive with injection moulding machines and other shoe machinery, are used in conventional shoe factories, and are used for both leather-upper and fabric-upper footwear.

4. The aforesaid revenue percentage of the shoe machinery market is a far more satisfactory index of share of the market than any other suggested. That index is far more illuminating than one based on a mere count of machines in position in shoe factories without distinguishing the machines by type, or value, or yield. It is also more satisfactory than one based on the value of annual shipments, an index which disregards the payment of rentals upon or conversion prices for machines shipped in previous years. It is a better index than one computed by the use of tables with 30 classifications according to the major and minor shoe machinery processes of the pre-1953 decree period, and referred to in the 1953 opinion, 110 F.Supp. at pages 304–305, 306. Those classifications do not reflect the extent to which technological changes require that there be grouped in two over-all classifications the machines used in competitive processes for (a) lasting and (b) sole attaching. Moreover, insofar as a tabular presentation is applied to machines in position in shoe factories in 1963 it fails to recognize that, unlike the situation in 1953, machines of United origin, not necessarily being on lease, are not necessarily sources of current payments by shoe factories and are not part of the current market.

5. There are many indicia confirming the correctness of the conclusion derived from the revenue index that United has about three-fifths to two-thirds of the shoe machinery market now, that is, a shrinkage of more than a quarter of the share of the market it had in 1953. (a) Although during the last decade the number of shoes produced annually rose, and therefore it may be inferred that the value of shoe machinery in the shoe factories rose, and although the value of the dollar declined, nonetheless United's total annual revenues from shoe machines sold and leased, from the sale of parts, and from repair services in 1955 was certainly less than before the decree. Indeed the combined lease and sale figures for United shrank from $32 million in 1955 to $24 million in 1963. During the same 1955–1963 period United's 12 most important domestic competitors doubled their gross revenues. (b) United's annual earnings before taxes of the Shoe Industry Group, after elimination of proceeds from conversion sales, had dropped from over $11 million at the time the de-

cree became effective to less than $6 million at February 29, 1964. (c) United's employment declined approximately 30 per cent in its Beverly plant and 40% in its service branch. (d) Of the machines shipped in 1963 in the 30 classifications shown in the tables used in 1953, United supplied 51.7 per cent, which is a figure combining 65 per cent of so-called major machines and 42.3 per cent of minor machines. (e) Of the machines now in shoe factories about 54 per cent were of United origin, but only 47 per cent were being leased from or had been bought from United.

6. Since the decree the number of United shoe machines on lease in domestic shoe factories fell from 91 to 26 thousand. Of the machines in domestic shoe factories only 17 per cent in 1963 were on lease from United. While approximately 90 per cent of the machines shipped by United in the post-decree decade have been on lease, a substantial number of them are ultimately bought by shoe factories. The reasons that most shoe factories initially lease rather than buy machines of the expensive types are not because the lease terms are not commercially related to sale terms, but because shoemakers prefer to have the right easily to dispose of expensive machines and because they lack either the financial ability or the inclination to invest substantial capital in shoe machinery. The continuation of the pattern of leasing expensive machines is a response to the demand from the shoe-making market which has 785 enterprises, many of them of modest resources. Without leases many of them could not continue in business.

7. The decree has tended to open the market by promoting the return of United machines by customers. For example, the total returns to United by customers of so-called major machines exceeded the total shipments by more than one-third during 1955–1964. This trend promotes competition by making the shoe factory a more frequent customer for shoe machinery.

8. In the decade 1953–1963 shoe factories purchased over 53,000 machines which they had previously leased from United. Most of the conversions occurred soon after the decree. But in the tenth year over 1300 machines were converted, and in 1964 the number was 678, which was more than one quarter of the machines United leased that year. Each purchase reduces United's power by making it likely that the machine will ultimately enter the second-hand market.

9. United has faced important competition from an active second-hand market, largely of its own machines. In 1963 that market sold about $3 million in machines, which stands comparison with United's revenues of $22 million from leases and $1.06 million from sales. The second-hand market is sufficiently vigorous so that it is not unusual now for shoe factories to start in business utilizing many machines originally of United manufacture, without obtaining a single machine from United.

10. At the end of 1955–1964 period there were about 126 suppliers of new shoe machines. The pace of entry into the market in each three-year period after the decree increased: from 11 to 19 to 26, or a total of 56 companies. None of these, however, is a company offering a wide line. Indeed while United offered 115 types of machines on current terms and 24 types on application, Compo Shoe Machinery Corporation offered only 22, International Shoe Machine Corporation only 5, and most companies only 1. The small companies have shown that in many sectors of the industry a machine manufacturer can be effective in one or several parts of the industry without the need of participating in other parts.

11. The unanimous and representative testimony of shoe makers is that there now exists in the shoe machinery market sufficient competition to allow the shoe manufacturers to select machinery as they wish on the merits of the machines available and in accordance with the processes they select to meet the various style changes in the consumers' market. In particular, United is subject to constant full and free competition from competitors' machines in toe lasting, side lasting,

sole attaching, pulling over, and bottoming. That kind of competition reveals that several of the 18 sub-classifications of "major machines" are in competition with one another and that percentage calculations based upon each separate classification are misleading unless machines which are in competition with one another are grouped together, thus reflecting the true character of the shoe machinery market.

12. In 1953 United had and exercised power to exclude competitors from every significant classification of shoe machinery except cement sole attaching machines.

13. However, by 1963 United was not in fact exercising, and indeed was incapable of exercising, exclusionary power over the entire market. This is shown not merely by its reduced share of the market, by its altered leases, and by the growth of competition from domestic manufacturers, importers, and secondhand machinery but by the following miscellaneous indicia.

(a) With respect to the lasting and sole attaching sectors of the market cement processing, injection molding, and direct-mold vulcanizing had become competitive with the seven older techniques,—McKay, Nail, Turn, Goodyear Welt, Stitchdown, Prewelt, and Lockstitch. Those older techniques, where United offered over 90 per cent of the machine types, declined from 55 per cent of the relevant sub-market in 1950, to 42 per cent in 1955, to 33⅓ per cent in 1963. In the newer techniques, United does not hold a commanding position. The result has been that United cannot control competition in the lasting sector as a whole or in the sole attaching sector as a whole.

(b) Of the shoe machines in position in shoe factories only 51 per cent had been shipped by United and only 17 per cent were covered by United leases. That finding, as already noted, does not show United's share of the entire market. But, inasmuch as from other evidence it appears that United's share of so-called major machines is far higher than its share of minor machines, it follows that in minor machines as a whole, and probably in most categories of minor machines, United has no exclusionary power.

(c) Of the shoe machines shipped in 1963, United's share by value may be as little as 48 per cent, and certainly is not much over 50 per cent. Here again, that finding, as already noted, does not show United's share of the entire market, because it eliminates current revenues from machines shipped in earlier years. But, in view of other evidence indicating that United's share of so-called major machines is far higher than its share of minor machines, it follows that in minor machines as a whole, and probably in most categories of minor machines, United has no exclusionary power.

14. In 1963 there were certain sectors of the shoe machinery market in which United was without significant competition, but it does not follow that United's position in those sectors was a result of United's exclusionary power or made competition unworkable. Indeed, it is more reasonable to conclude that the want of competition was due to the absence of a challenger of adequate, but not unusual, financial resources, skill, ability, and efficiency.

15. In almost every one of the 45 of the 187 operations in domestic shoe factories where United was the sole source of supply fewer than 6 machines a year are demanded and the operation, looked at alone, is not economically attractive. What is far more important, the operation is shown to be competitive with other operations for which other sources than United supply machines. On this record, it is inferrable that, for the purpose of the anti-trust acts, the machines used in the 187 operations ought to be combined to constitute perhaps as few as 7 markets, one for each stage of shoemaking. It is not clear whether after that was done United would have a dominant position in some of the sub-markets thus constituted.

16. If United does have a dominance in some of those sub-markets such dominance is not due to "restraints of trade" in the technical sense. There is a variety

of causative factors such as United's financial capacity to offer lease terms commercially equivalent to sales terms on the same machine types, United's broad line of machine products manufactured in one plant (which permits United with economic advantage to supply machine types for which there is a small annual market and which also permits United to set for different types of machines terms which reflect different rates of profitability), United's constant contacts with most shoe manufacturers as a result of the large volume of machines United ships annually and the large number of leases it has outstanding, and United's excellent products, superior skill in merchandising, efficiency in administration, inventions and know-how. Every one of those factors was known to this Court when it entered its decree in 1953. New information with respect to the operation of those factors since 1953 shows that they have not individually or collectively had an unforeseen effect or worked a grievous wrong.

From the foregoing findings of fact this Court concludes that the 1953 decree has operated in the manner and with the effect intended. It has put in motion forces which, aided by new technology, have eroded United's power and already dissipated much of the effect of United's monopolization.

In some sectors of the market, competition is already flourishing. In the sectors where it is not flourishing, all artificial barriers have disappeared and the position enjoyed by United is chiefly traceable to the fact that it has not yet been challenged by a competitor of financial resources of any magnitude. United follows no practice and enjoys no significant advantage which could preclude or restrain competition by an enterprise of a size comparable with leading machinery companies in other industries, that is, with resources adequate to offer lease terms commercially equivalent to sale terms and to offer simultaneously machine types in several categories where the annual demand is too thin to be economically supplied separately. The apparent reason why no such competitor has appeared is that compared with rates of return in other machinery markets, the rate of return in the shoe machinery market is unattractive.

■ It cannot rightly be said that a market or a sector thereof is, in the legal sense, not open to competition where an effective challenge may be made by an enterprise of resources common in comparable fields.

While this Court now has before it the facts of the decade 1954–1963 which were not known in 1953, nothing new, aside from the updating of the data, is involved. United has not created new barriers. In 1953 the resources of United in absolute terms were substantially the same as, and in comparative terms substantially more than, they are now.

It may have been an error in 1953 not to have dissolved United rather than to allow sectors of its power to be dissipated by small competitors, and to leave other sectors of power to be effectively attacked only when a small competitor became large or a large competitor appeared. But the choice was made in 1953 for reasons already adequately explained.

■ What the Government is complaining of is not that the decree did not work as expected, but that working in the foreseeable and intended way the decree did not accomplish what the Government had originally prayed for and what this Court had rejected. In short, the Government petitions that the decree be reversed because this Court erred in 1953. On the authority of United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, the Government's petition is denied.

■ United's petition stands no better. United wants to adjust the decree on the ground that the purposes of the decree have been accomplished and milder restraints are now in order. But the premise is unsound. The decree is still working at its long-range task of freeing the market from all consequences of United's monopolization and keeping the door wide open for the arrival of an adequately provided challenger. Until there are com-

petitors throughout the market, the decree should stand unmodified. United's petition is also denied.

Before concluding, this Court expresses its appreciation of the brief filed by *amici curiae*, the National Footwear Manufacturers Association and the New England Footwear Association. Their analysis of this case has greatly influenced this opinion. Their assurance that their clients, who represent substantially all the shoe manufacturers, who are among the chief intended beneficiaries of this Court's decree and who have had an unequalled opportunity daily to observe its effect in the last decade, are content with its operation and do not want it modified, gives added ground for leaving the decree undisturbed.

Petitions denied.