**BROADCASTING PUBLICATIONS, INC.**

v.

**BURNUP & SIMS, INC.**

**No. 81-6132-Civ.-JCP.**

United States District Court,
S.D. Florida,
West Palm Beach Division.

Feb. 14, 1983.

**310**

Roberts B. Larson, Harold L. Novick, Larson & Taylor, Arlington, Va., for plaintiff.

Robert E. Wagner, Wallenstein, Wagner, Hattis, Stampel, & Aubel, Chicago, Ill., for defendant.

## MEMORANDUM

MORTON *, Chief Judge.

This lawsuit concerns alleged trademark infringement, unfair competition, and trademark dilution under the statutory and common law of the State of Florida and the United States. Plaintiff, Broadcasting Publications, Inc., is a Delaware corporation with principal offices in the District of Columbia. Defendant, Burnup & Sims, Inc., is a Delaware corporation with principal offices in Fort Lauderdale, Florida. The complaint lists four counts that form the basis for this action. Count I alleges trademark infringement under section 32(1) of the Trademark Act of 1946, 15 U.S.C. § 1114(1); Count II alleges unfair competition under section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a); Count III alleges infringement and dilution of a trademark under sections 495.131 and 495.-151 of Florida Statutes; and Count IV alleges trademark infringement and unfair competition under Florida common law. Jurisdiction over the federal claims is premised upon 28 U.S.C. §§ 1331(a) and 1338. Pendent jurisdiction is asserted over the state law claims.

### I.

Defendant is a publicly held company, which owns approximately 20 subsidiaries operating in Florida and throughout the Southern and Southeastern United States. Its subsidiaries render various services including designing, engineering and installing cable television systems; designing, engineering and installing telephone systems; performing contract printing services; bottling soft drinks; providing food concession

---

* Visiting Judge, September 1982, Sitting by Desig- nation in the Southern District of Florida.

services; and operating a chain of motion picture theaters. A majority of the subsidiaries are concerned with telephone systems, cable television systems, satellite communication systems, and the provision and generation of electricity.

In an effort to develop a common corporate identity among its diverse subsidiaries, defendant adopted a corporate logo comprised of a stylized "BS" design. Prior to use of the logo, a trademark search was conducted to determine whether that particular design was available for use in connection with the services and goods offered by defendant's subsidiaries. No other design was found which, in the opinion of defendant's trademark counsel, would either subject defendant to infringement liability or prevent registration of the logo as a trademark. Satisfied that the "BS" design was available for adoption and use, defendant commenced using the symbol on August 1, 1979. Shortly thereafter, defendant prepared and filed in the United States Patent and Trademark Office an application for federal registration of its "BS" design, as illustrated in figure 1, and also filed an application for registration of the mark "BURNUP & SIMS AND DESIGN," illustrated in figure 2. The Patent and Trademark Office gave each application

**FIGURE 1**

**FIGURE 2**

a filing date of October 22, 1979. Both applications passed directly to publication in the Patent and Trademark Office Official Gazette, signifying a conclusion by the Office that defendant's logo was appropriate for registration and was not likely to cause confusion or mistake by comparison with any existing federal registration.

Plaintiff Broadcasting Publications, Inc., is engaged in the publishing business. Its primary publication is a weekly magazine, BROADCASTING, which is in essence a trade journal directing itself to the radio, television, and cable television broadcasting industries. Other periodicals published by plaintiff include an annual index to the aforementioned magazine; an encyclopedic yearbook, "BROADCASTING–CABLE-CASTING"; and a publication entitled "ACROSS THE DIAL," which lists all radio and television stations by city and state

with call letters and other information. Plaintiff also advertises and distributes books published and printed by others relating to the radio, television, and cable television industries.

Plaintiff began publishing BROADCASTING in 1931, as a journal covering the radio industry. As television, cable television, and satellite telecasting systems began to have an impact upon the broadcasting industry, the magazine broadened its focus accordingly. Styling itself in the beginning as "The News Magazine of the Fifth Estate," the shifting focus of BROADCASTING has been evidenced by intervening changes in its self-characterization from "The Weekly Newsmagazine of Radio" in 1943, for example, to "The Newsweekly of Radio and TV" in 1954, and "The Businessweekly of Television and Radio" in 1969. Other variations in style have been

apparent, but for purposes relevant here, attention is directed toward the use of what is termed a "lightning bolt" design throughout the magazine's history. The original publication carried such a design, as illustrated in figure 3. Evolution of the design is illustrated in figures 4, 5, 6, and 7. A version in use at the present time, which was first used in 1972, is illustrated in figure 8.

FIGURE 3

# BROADCASTING

Vol. 1 No. 1 PUBLISHED IN WASHINGTON, D. C., OCTOBER 15, 1931 · $3.00 the Year 15c the Copy

## THE NEWS MAGAZINE OF THE FIFTH ESTATE

FIGURE 4

JANUARY 4, 1954 35c PER COPY

# BROADCASTING
# TELECASTING

FIGURE 5

# BROADCASTING
# TELECASTING

THE BUSINESSWEEKLY OF RADIO AND TELEVISION JANUARY 7, 1957 35¢ PER COPY

FIGURE 6

JANUARY 4, 1965 50 CENTS 34TH YEAR

Broadcasting
THE BUSINESSWEEKLY OF TELEVISION AND RADIO

FIGURE 7

Jan. 13, 1969:Our 38th Year:50¢

# *Broadcasting*
### *THE BUSINESSWEEKLY OF TELEVISION AND RADIO*

FIGURE 8

# Broadcasting⚡May1
The newsweekly of broadcasting and allied arts
Our 41st year 1972

Since May 1972, the design shown in figure 8 has appeared on the cover of plaintiff's magazine directly adjacent to the title. At least two varying forms of the design have also appeared with headings for sections, features, or columns in the publication. Examples of two such headings are shown in figure 9

FIGURE 9

## Changing⚡Hands
## Editorials⚡

At least by 1953, plaintiff had registered the word "BROADCASTING" in the Patent and Trademark Office. Other marks associated with the magazine were registered in ensuing years, but those not concerning the "lightening bolt" symbol adopted in 1972 need not be referred to here. In May 1972, plaintiff sought registration of the mark "BROADCASTING—The Newsweekly of Broadcasting and Allied Arts & Design," an example of which is shown above in figure 8. Also in May 1972, plaintiff sought registration of the mark "BROADCASTING & design," illustrated in figure 10. In an amendment to this application, attention was drawn to plaintiff's prior registration of the word BROADCASTING, and it was noted that "[t]he mark of the present application is also for this word, but with the addition of a small symbol."

FIGURE 10

# Broadcasting⚡

In October 1974, plaintiff began using a particular layout in its magazine as a contents page. This layout is illustrated in figure 11. During November of the same year, a trademark application was filed describing the mark as follows: "BROAD-CASTING with lightning symbol on a black rectangular background listing the contents of the magazine by section and column page number and with a red line spaced from, and parallel to the upper edge of the rectangle." In September 1975, an

## FIGURE 11

amendment was filed which included the following clarification regarding plaintiff's claim to the mark:

> The application has been amended by the addition of a disclaimer to clarify that registration of the composite mark shown in the drawing *as a whole* is sought, and not registration of any of the individual components thereof.... The term BROADCASTING and the date are located side by side on the same line and visually connected by a relatively small intermediate design spaced therebetween.... Since the various individual aspects of the mark, including the date designation, have been disclaimed, there is no possibility that a false impression of the extent of applicant's right with respect to individual elements in the mark would be created ....

On May 15, 1980, some 8 years after use of the small "lightning bolt" symbol began and several months after plaintiff became aware that defendant had adopted its "BS" logo, plaintiff applied for federal registration of the "lightning bolt" symbol as a trademark. On the same date, plaintiff notified defendant in writing that it viewed the "BS" logo as an infringement. In February 1981, plaintiff applied for registration of the symbol as a trademark in Florida. This lawsuit was initiated on April 10, 1981.

## II.

A rather obvious conceptual difficulty that has confronted the court with respect to this lawsuit revolves around the question whether plaintiff can fairly claim establishment of a trademark consisting simply of its "lightning bolt" symbol. If the symbol alone cannot stand as a mark, elaborations upon practically all other issues presented in the case are of substantially less importance. Plaintiff noted in its trial brief, for example, that for purposes of comparison "[a] mark should not be split up into its component parts and then compared with corresponding parts of other marks." Nevertheless, plaintiff has concluded that "Plaintiff's symbol alone and Defendant's symbol alone should be compared." Frankly, the court is not at all convinced that this conclusion is justified.

■ Plaintiff uses the small "lightning bolt" design on the cover of its magazine immediately following the word "BROADCASTING." Within the magazine, the symbol is used with various other words. Notably missing from any of the products distributed in commerce by plaintiff is any use of the symbol alone, such that a consumer would be invited to identify the originator of goods by reference to that symbol alone. Rather, it would appear that the symbol itself is made identifiable by contiguity with the long-registered trademark "BROADCASTING." The question whether plaintiff has actually been successful in establishing its symbol alone as a trademark in the minds of consumers is thus essentially forestalled, since no effort has

been directed toward doing so.[1] To state this concept another way, it can hardly be found that consumers identify plaintiff or plaintiff's products by merely seeing the symbol alone, because they never have that opportunity,[2] and it therefore cannot be said that plaintiff has established secondary meaning in its symbol. Moreover, there is no evidence whatsoever that consumers tend to identify the symbol with plaintiff, as the producer of products, rather than with BROADCASTING itself, a product. *Cf. Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, 78 (1938) (to establish secondary meaning in trade name party "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer").

It is apparent that plaintiff, in its dealings with the Patent and Trademark Office, has previously disclaimed any intent to register the "lightning bolt" symbol or other individual components of a composite mark, and also that plaintiff has downplayed the symbol's role by emphasizing the dominance of words in marks submitted for registration. Plaintiff has correctly pointed out that such *ex parte* representations should not in and of themselves give rise to an estoppel. Removing the technical issue of estoppel does not alter the troublesome fact, however, that plaintiff's conduct has never been inconsistent with the representations that were made. Clear though it may be that "[s]tatements made during an *ex parte* prosecution before the United States Patent and Trademark Office seeking registration of a trademark do not circumscribe for all time the rights the registrant may acquire thereafter through extensive use," *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555, 561 (S.D.N.Y.1978) (citations omitted), it is not so clear that such statements should be ignored merely because their proponent now says they are not true. Plaintiff's use of the "lightning bolt" symbol has not changed, yet now it is to be viewed alone as an exceedingly noble, independent mark and not as a mere component of an otherwise distinctive mark.

■ Apparently plaintiff would buttress its claim that the "lightning bolt" symbol is a trademark by referring to registration of the symbol alone in the Office of the Secretary of State of Florida. But arguments on this point tend to move in a rather tight circle. The Florida registration means little or nothing unless the trademark has been established as such through usage. *See Abner's Beef House Corp. v. Abner's Int'l, Inc.*, 227 So.2d 865 (Fla.1969). The symbol has not been used in Florida any differently than it has been used elsewhere, and absent use of the symbol itself as a trademark the Florida registration papers are simply papers. Writing for the Florida Supreme Court, Chief Justice Ervin made clear in *Abner's Beef House* that the Florida statute

> is intended to supplement the common law and systematize the subject of trade-names and trademarks acquired by usage by affording identification and protection of the same for the benefit of their registering owners. But by its terms the statute is not intended as a shortcut to vest by mere registration the exclusive ownership of a tradename or trademark in the state absent the supporting factor of common law usage.

*Id.* at 869. Thus, resort to plaintiff's Florida registration is not a shortcut here and is of no assistance in this case.

---

**1.** Certain of plaintiff's witnesses, who professed to read plaintiff's magazine weekly as "the bible of the [broadcasting] industry," testified that they recognized the symbol. The probative value of their testimony is questionable, to say the least. In the way of understatement it can simply be said that the earmarks of an objective consumer survey were missing.

**2.** Plaintiff has proffered exhibits numbered 62, 63, and 65, alleging that they represent use of the symbol alone in the promotion of BROADCASTING. The court does not agree with such a characterization. Rather, the flyers or inserts depicted in those exhibits merely represent another instance in which plaintiff uses its symbol year after year with the same accompanying words.

Plaintiff has not been granted registration by the Patent and Trademark Office for its symbol alone. Defendant's opposition to the application was dismissed by the Trademark Trial and Appeal Board for failure to state a claim upon which relief could be granted, but leave was given to file an amended notice of opposition. Dismissal was warranted, in the Board's opinion, because defendant had failed to state its claim "in appropriate terminology." Further, the Board stated:

It appears that opposer's contention is that applicant is not entitled to a registration because the matter it seeks to register is not used, in and of itself, as a trademark; that is, that the "LIGHTNING BOLT DESIGN" is used by applicant only as part of a composite mark; that, as used on the specimens submitted, the design does not create a commercial impression separate and apart from that created by the composite mark as a whole; and hence that the "LIGHTNING BOLT DESIGN" is not applicant's mark as actually used but is rather a mutilation thereof. If in fact this is opposer's position, it has failed to plead this ground for opposition with sufficient specificity.

The obvious implication left by the Board's discussion is that defendant may properly oppose any effort by plaintiff to split out a portion of a composite mark and identify it as a mark alone. This court agrees, and would hold only with great difficulty that

plaintiff is attempting to do otherwise here. The conclusion is inescapable that plaintiff seeks here to establish trademark status for its symbol alone despite, rather than because of, its prior use of the symbol. It has long been established that a symbol should not be accorded such status where "[t]here is nothing in the record to indicate that applicant promotes or emphasizes the design separate and apart from [associated] wording, or that purchasers rely upon the design alone to identify and distinguish applicant's products." *In re Magnetics, Inc.*, 123 U.S.P.Q. (BNA) 455, 456 (T.T.A.B. 1959).

Ostensibly in an attempt to show widespread use of the "lightning bolt" symbol, plaintiff has injected a separate, rather confusing element into this case with respect to identification of its alleged mark. That is to say, plaintiff apparently contends that any use by it of a "lightning bolt" should be deemed a trademark usage, or at least usage that furthers the establishment of a trademark in some manner. Merely viewing some of the variant forms such use has included, as they are illustrated in figure 12, makes the reason for potential confusion obvious. It is safe to presume that plaintiff does not claim trademark rights in every design whatsoever that might be pierced by something resembling a lightning bolt. Nevertheless, use of the designs shown here would make precise delineation of the rights claimed by plaintiff difficult at best, even apart from other factors.

## FIGURE 12

 

## II.

Even if the court should be inclined to consider plaintiff's "lightning bolt" design in some form as an isolated figure, the result reached here would not differ. This conclusion is based upon examination of this case in light of the factors outlined in *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500 (5th Cir.1980). *See also Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160 (11th Cir.1982).

 Despite plaintiff's strenuous efforts to argue the contrary, it is quite obvious that the "lightning bolt" symbol is inherently weak when used in any business touching upon electronics, communications, or broadcasting. *See* 628 F.2d at 504. The court has, in fact, been unable to locate in this record a single issue of plaintiff's magazine that does not contain advertisements displaying a "lightning bolt" symbol of one type or another. More to the point, a good many of the symbols—and also various third-party registrations submitted by defendant—bear more than a passing resemblance to the more common forms of plaintiff's "lightning bolt." Perhaps the connection to be drawn between these various symbols used in broadcasting and related industries was best framed by one of plaintiff's witnesses, who referred to the BROADCASTING "radio wave." The court can hardly avoid noticing that plaintiff's symbol and numerous others are intended as visual representations or reminders of radio, television, microwave, or other transmission signals. Whether or not electric companies, the field of electronics as a whole, or other industries are considered as well, contentions that a "lightning bolt" symbol can be in and of itself totally fanciful, wholly arbitrary, and completely nondescriptive, are for purposes of this case not to be taken seriously. Furthermore, the somewhat gradual evolution of plaintiff's symbol, illustrated in figures 3 through 8 above, hardly lends support to an argument that the design was arbitrarily plucked from thin air.

Insofar as a subjective look at design similarity is concerned, it might be noted that the *Exxon* court considered entire trademarks as they were used by the parties, and also drew attention to the use of colors. 628 F.2d at 504–05. Here it is quite noticeable that when plaintiff presents its symbol in color, such as on the cover of BROADCASTING, it is always red. When defendant's symbol is presented in color, it contrasts rather sharply in orange and brown. Thus, when the symbols are used at trade shows, for example, there is very little similarity between the impressions created by each design. Where color is not a factor, the degree to which the designs bear a resemblance to each other depends upon which variation of plaintiff's design one happens to be confronted with at a particular time. *Compare* figure 1, *supra, with,* figure 12, *supra.* The court finds moreover that basic structural differences in the designs, such as rounded corners and a comparatively broad area of separation between individual sections in defendant's logo, sharply lessen the likelihood that one symbol will be mistaken for another. Finally, when the designs are considered by viewing them as they are actually used in terms of size, relationship to printed words, and otherwise in proper context, there is practically no reasonable basis for confusing the two.

The third *Exxon* factor concerns similarity of products. There is not really any similarity of products in this case at all. Plaintiff is a publisher. Defendant is, through its subsidiaries, a producer of various goods and services, but it cannot in any realistic sense be characterized as being in the publishing business. Straining to perhaps the utmost possible extent, plaintiff has offered its exhibit 262 as evidence that defendant is a "publisher" of sorts. That exhibit is a pamphlet entitled "Resort & Business Guide," which the Southeastern Printing Company produces in Florida for the Stuart/Martin County Chamber of Commerce. It is a typical community-promotional booklet most prominently featuring advertisements for resorts, motels, restaurants, realty, and other items hopefully

offered by the Chamber of Commerce as objects of interest to tourists. It is not similar to any of plaintiff's products, and in fact does nothing to dispel the impression that Southeastern Printing is a contract printer rather than a publishing company.[3]

The fourth *Exxon* factor regards identity of retail outlets and purchasers. It can quite simply be said that there is no commonality of retail outlets here. Plaintiff offers its products through the mail by subscription, and defendant does not market any of its products or services in a similar fashion. A connection can be drawn between consumers pursued by the parties, on the other hand. Although neither plaintiff nor defendant is actually a principal in the broadcasting industry, both do serve consumers involved in that industry. Plaintiff produces a trade journal and other specialized trade publications directed toward broadcasters, while certain subsidiaries of defendant provide technical equipment and construct broadcasting systems, such as earth stations for reception of satellite transmissions. It is well worth noting that where this overlap of consumers occurs,[4] there is no perceptible likelihood of confusion on the part of those who wish to purchase from either of the parties to this action. All of plaintiff's own witnesses who were potential purchaser's of defendant's equipment admitted, for example, that there was no chance they might buy earth stations and such without being very familiar with the manufacturer. The products and services provided by defendant for the broadcasting industry, in other words, are simply too sophisticated and expensive for a consumer to purchase merely on the basis of a logo. This is clearly not a case in which consumers who might choose between products related to the broadcasting industry will be "casual [or] relatively unknowledgeable buyers." *Omega Import-*

*ing Corp. v. Petri-Kine Camera Corp.,* 451 F.2d 1190, 1195 (2d Cir.1971).

In the area of advertising, there appears to be little similarity between the parties. Plaintiff cannot be said to use any type of advertising campaign other than through distribution of its products or direct self-promotion, while defendant apparently advertises through various channels. On at least one occasion the advertising activities of the parties converged to some extent when Gardiner Communications advertised its earth stations in BROADCASTING. But the court would venture to say that the advertisement could hardly contribute to confusion on the basis of defendant's logo alone, particularly in light of the facts that Gardiner is expressly identified as "A Burnup and Sims Company" and that a consumer could easily dispel any vestige of initial confusion by comparing defendant's symbol with those of plaintiff appearing elsewhere in the magazine.

Insofar as defendant's intent is a pertinent factor, the court would state bluntly that there is absolutely no evidence tending to suggest that defendant has set out to deceive consumers.

With respect to actual confusion as a factor under *Exxon,* two points should be touched upon. First, there is no evidence that a single consumer has ever been actually confused while choosing to purchase a product or service offered by the parties. *Cf. Roto-Rooter Corp. v. O'Neal,* 513 F.2d 44 (5th Cir.1975) (four witnesses had employed Rotary De-Rooting when they had intended to employ Roto-Rooter). Second, no survey evidence is presented in this case such that either actual confusion or a likelihood of confusion is shown. *Cf. Exxon, supra,* 628 F.2d at 506–07 (automobile drivers surveyed at random regarding similarity between signs used by Exxon and Texon). This court is not alone in deeming these two particular omissions relevant.

---

**3.** If further proof were necessary, it could also be noted that Southeastern Printing does not have an editorial staff and does not employ so much as a single writer.

**4.** Plaintiff directs its products exclusively toward individuals related to the broadcasting industry either professionally or as students. *See, e.g.,* p. 104(a). Defendant's broader variety of goods and services, of course, attracts a much larger range of consumers.

*See, e.g., McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1136 (2d Cir.1979); *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 160 (S.D.N.Y. 1980). The only testimony in this case that might possibly bear upon actual confusion was given by a professional broadcaster who testified that on one occasion when he was driving his car he happened to notice the "BS" logo on a Burnup & Sims truck. He says he casually wondered whether Burnup & Sims might own BROADCASTING or whether BROADCASTING might own Burnup & Sims. Then he went on his way and forgot the whole matter. This single alleged instance of "confusion" is hardly a foundation upon which this court is tempted to base its decision. The whimsical thoughts of a man waiting for a traffic light are not viewed as sufficient to carry the day on the issue of actual confusion, in the absence of any other proof whatsoever. *See McGregor-Doniger, supra,* 599 F.2d at 1136.

## III.

On the basis of the foregoing findings of fact and conclusions of law, the court holds that neither infringement of plaintiff's alleged trademark nor unfair competition has been shown such as would be cognizable under either federal law or Florida law. In the marketing of products and the use of the parties' respective symbols—even if symbols alone are considered—there is not such a "likelihood of *confusing* similarity," *Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1261 (5th Cir.1971), that infringement can be found. Nor is there the slightest hint in this case that defendant is guilty of attempting to "palm off" any of its goods or services by means of its mark, such that unfair competition might be found. *See id.* at 1261–62.

Finally, plaintiff's claim of trademark dilution under the Florida statute is rejected for at least two basic reasons. First, the court is not convinced that plaintiff has presented a strong or distinctive mark that is subject to being substantially weakened. To say the least, there is room for consider-

able doubt whether a mark distinguished only by the presence of a "lightning bolt" can be characterized as a strong mark. Apart from that consideration, the court has indicated that it is unaware of any usage of the symbol alone as a trademark so that its relative strength should even be considered alongside numerous other "lightning bolt" symbols. Second, the court holds that the marks of the parties, as those marks are actually used, are not confusing. *See Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445 (5th Cir.1973).